Original

ORIGINAL

Approved: _____
EMILY DEININGER
Assistant United States Attorney

Before:   THE HONORABLE KATHERINE H. PARKER
          United States Magistrate Judge
          Southern District of New York

22 MAG 6402

- - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

        - v. -

MOISES HANONO AZRAK,
        a/k/a "Moe,"

                        Defendant.

- - - - - - - - - - - - - - - - - - - X

:
:
:
:
:
:
:
:
:
:
:

**SEALED COMPLAINT**

Violation of
18 U.S.C. § 1956(h)

COUNTY OF OFFENSE:
NEW YORK

SOUTHERN DISTRICT OF NEW YORK, ss.:

        EDWARD MATEO, being duly sworn, deposes and says that he is a Special Agent with the United States Drug Enforcement Administration ("DEA"), and charges as follows:

### COUNT ONE
### (Conspiracy to Commit Money Laundering)

        1.   From at least in or about 2020 through at least in or about July 2022, in the Southern District of New York and elsewhere, MOISES HANONO AZRAK, a/k/a "Moe," the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit money laundering, in violation of Title 18, United States Code, Section 1956(a)(1)(B).

        2.   It was a part and an object of the conspiracy that MOISES HANONO AZRAK, a/k/a "Moe," the defendant, and others known and unknown, knowing that the property involved in certain financial transactions represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such financial transactions, which in fact involved the proceeds of specified unlawful activity, to wit, (i) felonious narcotics offenses, in violation of Title 21, United States Code; and (ii) offenses against a foreign nation involving the manufacture, importation, sale, or distribution of a controlled substance (as

such term is defined for purposes of the Controlled Substances
Act), knowing that the transactions were designed in whole or in
part to conceal and disguise the nature, the location, the
source, the ownership, and the control of the proceeds of the
specified unlawful activity, and to avoid a transaction
reporting requirement under State and Federal law, in violation
of Title 18, United States Code, Section 1956(a)(1)(B)(i) and
(ii).

       (Title 18, United States Code, Section 1956(h).)

       The bases for my knowledge and for the foregoing
charges are, in part, as follows:

       3.   I have been a DEA Special Agent for approximately four
years During that time, I have participated in numerous
investigations of unlawful drug distribution as well as money
laundering. During the course of those investigations, I have
conducted or participated in surveillance, drug transactions
with undercover officers and confidential informants, the
introduction of undercovers, the execution of search warrants,
debriefings of witnesses, and reviews of taped conversations and
drug records. Through my training, education, and experience, I
have become familiar with the manner in which illegal drugs are
imported and distributed; the way in which illegal drugs are
prepared, packaged, and sold on the street; some of the methods
of payment for such drugs; and some of the methods that are used
to disguise the source and nature of the profits made by drug
dealers.

       4.   This affidavit is based on that experience, my
conversations with other law enforcement officials, and my
examination of reports and records. Because this affidavit is
being submitted for the limited purpose of demonstrating
probable cause, it does not include all the facts I have learned
during the course of my investigation. Where the contents of
documents and the actions, statements, and conversations of
others are reported herein, they are reported in substance and
in part, except where otherwise indicated.

<u>Overview</u>

       5.   Based on my experience and training, and my
participation in this investigation, I know that drug
trafficking organizations ("DTOs") use the international trade
and financial systems to transfer money obtained through the
sale of narcotics in the United States across international

borders and disguise the illicit original of the proceeds.
Specifically, after drugs are sold for dollars in the United
States, a foreign DTO extends a "contract," which are offers to
purchase narcotics proceeds (usually United States dollars), to
a money laundering broker. Once the U.S. dollars are delivered,
typically through a bulk cash pickup in the United States, the
broker releases the agreed upon amount of currency in the
narcotics trafficker's home country. The money laundering
broker then introduces the narcotics proceeds into the U.S.
banking system, including through the use of corporate shell
entities. The money laundering broker may then use the funds to
purchase goods, either from the United States or other markets,
that can be transported to the broker's home country and sold
for value. This system, which allows drug traffickers to
collect narcotics proceeds in their home country without ever
sending money in cross-border transactions from the United
States, is known as the Black Market Peso Exchange ("BMPE").

6.     Since in or about 2019, DEA has been investigating a
number of individuals based in Mexico who participate in the
repatriation of drug cartel proceeds to Mexico and other
countries through the BMPE. As set forth in greater detail
below, the investigation has uncovered that MOISES HANONO AZRAK,
a/k/a "Moe," the defendant, is a money-laundering broker based
in Mexico City, Mexico. AZRAK helps drug cartels arrange to get
money from the United States and other countries back to Mexico
and other countries through the BMPE.

7.     As set forth in greater detail below, between in or
about 2020 through at least in or about July 2022, MOISES HANONO
AZRAK, a/k/a "Moe," the defendant, facilitated the laundering of
approximately $3.6 million of narcotics proceeds.

<u>Introduction of AZRAK to CS-1</u>

8.     As part of the investigation, I and other DEA agents
have debriefed a confidential source ("CS-1").[1] Based on my
conversations with CS-1 and other law enforcement officers, my
review of law enforcement reports regarding CS-1, and my

---

[1] CS-1 has been cooperating with law enforcement since early 2018. CS-1 has pled guilty to money laundering offenses and is cooperating in the hopes of receiving leniency at sentencing. Information CS-1 has provided has been corroborated by other evidence gathered, including bank records, toll records, and information provided by other confidential sources.

training and experience, I have learned the following, in substance and in part:

a.    Prior to cooperating with the Government, CS-1 was a broker for money-launderers located across the world, including Mexico, Columbia, Hong Kong, Israel, and elsewhere.  CS-1 would receive "contracts," which are offers to purchase narcotics proceeds (usually United States dollars) for currency in the narcotics trafficker's home country, often at a discount.  CS-1 would work on behalf of other money-laundering brokers, helping them retrieve narcotics proceeds in the United States and sending those proceeds to U.S. bank accounts in the name of shell companies in exchange for a commission.

b.    In or about September 2020, CS-1 was contacted by another DEA confidential source based in Mexico City, Mexico ("CS-2").[2] CS-2 informed CS-1 that CS-2 had been introduced to two individuals, one of whom was known as "Moe," who could provide U.S.-based accounts for the purposes of laundering narcotics proceeds.

c.    CS-2 stated that CS-2 had given CS-1's contact information to "Moe" and told "Moe" that CS-1 was responsible for coordinating all bulk cash pickups and wire transfers.

d.    CS-2 then provided CS-1 with a telephone number for "Moe."

e.    In or about October 2020, CS-2 identified a photograph of MOISES HANONO AZRAK, a/k/a "Moe," the defendant, which was obtained from a United States visa application submitted by AZRAK, as the individual CS-2 knew as "Moe."

## Money Laundering Transactions

9.    Based on my participation in this investigation; my conversations with others, including law enforcement officers and CS-1; and my review of communications, including WhatsApp chats

---

[2] CS-2 has been cooperating with law enforcement since 2019.  Prior to cooperating with the Government, CS-2 was a broker for money-launderers located across the world, including Mexico, Columbia, Hong Kong, Israel, and elsewhere.  CS-2 is cooperating with law enforcement in exchange for financial compensation.  Information CS-2 has provided has been corroborated by other evidence gathered, including bank records, toll records, and information provided by other confidential sources.

and recorded conversations, between CS-1 and MOISES HANONO AZRAK, a/k/a "Moe," the defendant, I have learned the following, in substance and in part:

a.    Between in or about October 2020 and in or about July 2022, AZRAK gave more than 40 money laundering contracts for bulk cash pickups to CS-1, for a total of more than $3.6 million. During that time period, CS-1 communicated with AZRAK extensively, primarily through WhatsApp chats and calls,[3] to arrange those bulk cash pickups and for AZRAK to provide CS-1 with instructions on where the funds should subsequently be sent.

b.    DEA undercover operations associated with the money laundering contracts AZRAK passed to CS-1 resulted in the seizure of more than $2 million in narcotics proceeds in cities across the United States, in addition to seizures of substantial quantities of narcotics and at least one firearm.

c.    For example, in or about October 2020, a money laundering broker who has historically given contracts to CS-1 ("CC-1"), gave CS-1 a contract for a bulk cash pickup of United States currency located in Appleton, Wisconsin. Specifically, the following occurred:

i.    On or about October 12, 2020, CC-1 told CS-1 that CC-1 had a pickup of currency available in Appleton, Wisconsin. At the direction of law enforcement, CS-1 accepted the contract and provided CS-1 with a dollar bill serial number ("Bill Code-1") that could be used to corroborate the involvement of another individual in the pickup.

ii.    On or about October 13, 2020, an unknown male ("UM-1") called CS-1, provided Bill Code-1, and requested a pickup of approximately $100,000.

iii.    On or about October 16, 2020, an undercover officer ("UC-1") met with UM-1 at a pre-arranged location in Appleton, Wisconsin, where UM-1 gave UC-1 a grey bag containing an Amazon Prime package that was later determined to contain $105,990 in United States currency.

iv.    On or about October 21, 2020, AZRAK contacted CS-1 and instructed CS-1 that the funds picked up in Appleton should be split up and wired to three bank accounts, including one

---

[3] CS-1 has provided copies of those WhatsApp chats to the DEA.

held by a corporate entity with an address in Port Chester, New York.

        v.    Law enforcement agents involved in this investigation then sent wires totaling $101,450 to those accounts, including a wire transfer to $57,450 the corporate entity located in Port Chester.

        d.    In or about October 2020, AZRAK passed a money laundering contract to CS-1 for approximately $150,000 in Chicago, Illinois, as follows:

        i.    On or about October 13, 2020, AZRAK told CS-1 that there he had a bulk cash pickup available in Chicago, Illinois. At the direction of law enforcement, CS-1 accepted the contract and provided AZRAK with a dollar bill serial number (the "Serial Number") that could be used to corroborate the involvement of another individual in the pickup.

        ii.    On that same day, an unknown male ("UM-2") contacted CS-1, provided the Serial Number, and stated that he had $300,000 in cash to give to CS-1.

        iii.    On or about October 16, 2020, an undercover officer ("UC-2") arranged to meet with UM-2 in the parking lot of a hardware store located in Broadview, Illinois, where an unknown female gave UC-2 a white backpack that was later determined to contain approximately $200,000 in United States currency.

        iv.    On or about October 20, 2020, AZRAK directed CS-1 to wire the funds to four separate bank accounts. Law enforcement agents involved in this investigation then sent wires in the amounts of approximately $150,000, $27,300, $9,000, and $6,700, for a total of $193,000 (totaling the $200,000 that had been picked up minus a $7,000 "commission"), to the four accounts identified by AZRAK.

        e.    In or about October 2021, AZRAK passed a money laundering contract to CS-1 for approximately $220,000 in Los Angeles, California, that resulted in a seizure of narcotics proceeds, narcotics, and a firearm, as follows:

        i.    On or about October 13, 2021, AZRAK advised CS-1 that there was $220,000 in United States currency in Los Angeles, California that needed to be picked up. CS-1 then provided AZRAK with the telephone number of a DEA undercover officer ("UC-3") in Los Angeles.

ii.   That same day, UC-2 received a phone call from an unknown male ("UM-3"), who arranged to meet UC-3 the following day.  In a separate call shortly thereafter, UM-3 confirmed that he had $120,000 for UC-3 to pick up.

iii.   On or about October 14, 2021, UM-3 and UC-3 arranged for another unknown male ("UM-4") and another undercover officer ("UC-4") to meet at a hardware store located in Ontario, California.  During that meeting, UM-4 gave UC-4 a black backpack that was later determined to contain approximately $120,000 in cash wrapped in vacuum sealed bundles.

iv.   Later that day, UM-3 contacted UC-3 and arranged for a second amount of bulk currency to be delivered by UM-4 to UC-4 at the same location in Ontario, California.

v.   Shortly thereafter, law enforcement officers performing physical surveillance of UM-4's vehicle stopped the car for a vehicle code violation while it was driving towards the arranged meeting location.  During the stop, UM-4 consented to a search of the car. The officers discovered $120,000 in bulk cash hidden in a concealed compartment.

vi.   UM-4 then consented to a search of his residence in Upland, California.  During a search of that residence, law enforcement officers found a handgun, one kilogram of cocaine, and another car with the passenger airbag removed in a manner that created a hidden compartment.

f.   In or about December 2021, AZRAK gave another money laundering contract to CS-1, for approximately $150,000 in Omaha, Nebraska, that resulted in a seizure of narcotics proceeds and narcotics, as follows:

i.   On or about December 6, AZRAK advised CS-1 that there was approximately $150,000 in United States currency located in Omaha, Nebraska that needed to be picked up.  CS-1 then provided AZRAK with the phone number of a DEA undercover officer ("UC-5") located in Omaha, Nebraska.

ii.   UC-4 was subsequently contacted by an unknown male ("UM-5") regarding arrangements for the cash pickup.

iii.   Based on, among other things, the telephone number used by UM-5, DEA agents subsequently identified UM-5 and conducted surveillance on UM-4's residence (the "UM-5 Residence").

On or about the morning of December 13, 2021, a DEA special agent observed UM-5 exit the UM-5 Residence and drive a black van northward. Shortly thereafter, law enforcement agents conducted a traffic stop of the black van. During the stop, UM-5 advised that he was in possession of $150,000 in United States currency. During a search of the van, multiple bundles of United States currency wrapped in plastic wrap were found within a black toolbox.

iv.   During a subsequent interview, UM-5 told law enforcement agents, in substance and in part, that he had received the cash seized from the black van from an individual ("UM-6") who distributed cocaine, that he had been directed by UM-6 to deliver the cash to an unknown person who would meet him at a hardware store located in Omaha, Nebraska, and that UM-5 was on his way to make the delivery of the bulk cash when the traffic stop took place. UM-5 provided the telephone number of UC-5 as the number of the person he was supposed to meet at the hardware store.

v.   DEA agents then obtained a judicially authorized search warrant for a residential address identified as being used by UM-6. On or about February 17, 2022, during the execution of that search warrant, approximately 590 grams of cocaine were found along with several digital scales and narcotics packaging materials.

vi.   During an interview conducted later that day, UM-6 acknowledged distributing cocaine and stated that the approximately $150,000 that had been seized from UM-5 was derived from the sale of cocaine.

### August 2022 Interview of AZRAK

10.   Based on my participation in a July 31, 2022 interview of MOISES HANONO AZRAK, a/k/a "Moe," the defendant, I know that, on or about July 31, 2022, Special Agents with the DEA approached AZRAK aboard a cruise ship that had docked in Seattle, Washington. AZRAK agreed to speak with the agents, and they then travelled together to the DEA's Seattle Division Office. AZRAK was read his *Miranda* rights and signed a written form consenting to be interviewed without an attorney present. AZRAK then told the law enforcement agents, in substance and in part, the following:

a.    AZRAK began "trading money" in or about 2015.   In or about 2018, AZRAK was asked by a client if he could receive cash in the United States and make payments in Mexico City. AZRAK then began coordinating bulk cash pickups in the United States.   AZRAK charged a 4% fee for his role in the transactions.

b.    AZRAK worked with several other individuals, based both in Mexico City and the United States, to remit money from the United States to Mexico City.

c.    AZRAK received contracts from at least two individuals, both of whom were Mexican and based in Mexico City.

d.    AZRAK obtained U.S.-based bank accounts that could be used for money laundering transactions from at least three other individuals, including a money laundering broker who had been identified during the course of this investigation ("CC-2").  CC-2 provided AZRAK with accounts that could be used in connection with the bulk cash pickups being conducted in the United States.

e.    AZRAK stated that he understood that the money came from drugs based on the fact that it was being picked up in the United States and secretly brought to Mexico to pay random people.

f.    AZRAK indicated that he wanted to cooperate with law enforcement, and agreed to travel from Seattle to New York City to participate in further debriefings.

11.  Based on my participation in this investigation and my conversations with others, including my conversations with other law enforcement officers and CS-1, I know that CC-2 is a money-laundering broker based in Mexico City who, between in or about 2019 and 2021, facilitated the laundering of approximately $2.2 million of narcotics proceeds.  CC-2 provided CS-1 contracts for more than 30 bulk cash pickups in the United States, including, in or about February 2020, a bulk cash pickup of approximately $55,000 from a location in Manhattan, New York.

August 3, 2022 Communications Between AZRAK and CC-3

12.   MOISES HANONO AZRAK, a/k/a "Moe," the defendant, travelled from Seattle, Washington, to New York, New York, accompanied by me and another law enforcement agent, on or about August 1, 2022.

13.   Based on my participation in this investigation, my conversations with CS-1, and my review of WhatsApp chats between CS-1 and another money laundering broker identified during the course of this investigation ("CC-3"), I know that on or about August 3, 2022, CC-3 contacted CS-1 via WhatsApp and wrote, in substance and in part, the following:

        a.   CC-3 stated that he had something urgent to tell CS-1.  CS-3 then explained that CC-3 and CS-1 both needed to change their phone numbers because "Moy" had been detained in the United States the previous Sunday while on a cruise to Alaska that left from Seattle.

        b.   CC-3 told CS-1 that he had received this information "directly from [Moy's] employees."

        c.   CC-3 told CS-1 that "Moy" had been asked to cooperate with the "agency of the 3 letters" and that he was now in New York waiting to proffer with prosecutors in the next few days.  Based on my training, experience, and participation in this investigation, I believe that the "agency of the 3 letters" refers to the DEA.

        d.   CC-3 then re-emphasized to CS-1 that they should change their numbers, and also that CS-1 should warn another individual that CS-1 works with.

14.   Based on my participation in this investigation and the interview of MOISES HANONO AZRAK, a/k/a "Moe," the defendant, conducted on July 31, 2022, I know that AZRAK did not identify CC-3 as someone that AZRAK engaged in money laundering activities with or otherwise mention CC-3 during the course of that interview.

        WHEREFORE, the deponent respectfully requests that a warrant be issued for the arrest of MOISES HANONO AZRAK, a/k/a "Moe," the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

_/s/ Edward Mateo w/ permission_
EDWARD MATEO
Special Agent
Drug Enforcement Administration


Sworn to before me by reliable electronic means this
_4_ th day of August, 2022

Katharine H Parker

THE HONORABLE KATHERINE H. PARKER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK